Filed 12/27/23  Corlin v. Bry CA2/3

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| ADAM CORLIN, | B315560 |
|---|---|
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC123103) |
| v. | |
| RICHMAN BRY, | **ORDER MODIFYING OPINION AND DENYING REQUEST FOR PUBLICATION AND PETITION FOR REHEARING** |
| Defendant and Respondent. | **[NO CHANGE IN JUDGMENT]** |

BY THE COURT:

Appellant's petition for rehearing, filed December 14, 2023, is hereby denied.  The December 15, 2023 request for publication of opinion filed by counsel for Appellant, Janice R. Mazur, is hereby denied.

It is further ordered that the opinion filed herein on November 29, 2023, is modified as follows:

On page 4 of the opinion, in the paragraph that begins, "In 2012, through his certified public accountant, Cooper signed and filed the LLC's federal 2011 tax return," the words "signed and" are deleted. The word "federal" is deleted and replaced with "California."

There is no change in judgment.

_____

EDMON, P. J.        LAVIN, J.        EGERTON, J.

Filed 11/29/23  Corlin v. Bry CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ADAM CORLIN, | B315560 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. SC123103) |
| RICHMAN BRY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig D. Karlan, Judge.  Affirmed.

Humphrey+Grant, James T. Grant, J. Scott Humphrey; Mazur & Mazur and Janice R. Mazur for Plaintiff and Appellant.

Law Offices of Jonathan P. Chodos and Jonathan P. Chodos for Defendant and Respondent.

———————————————

## INTRODUCTION

In 2011, plaintiff Adam Corlin and his friend Glenn Cooper agreed on a real estate venture to purchase and sell for profit a residential property (the property) on Berkeley Street in Santa Monica. Cooper financed the venture and plaintiff managed the construction, for which he received $120,000; they agreed to share in the profit from the sale. Berkeley View, LLC (the LLC), created by Cooper, held title to the property. However, the purchase and renovation of the property was so costly that by the time the property was ready for a buyer, Cooper owed more than it was worth. Before the property was sold, Cooper passed away. Cooper's widow then transferred the LLC to defendant Richman Bry, the lender whose loans funded the venture. In exchange, Bry forgave Cooper's debts.

Plaintiff brought the present lawsuit for intentional interference with contractual relations against Bry, Cooper's widow, and the LLC's non-member manager. Plaintiff also alleged a cause of action to dissolve the LLC. Only the claims against Bry and the LLC are at issue on appeal. The operative pleading alleged Bry knew plaintiff had a 50 percent membership interest in the LLC, unlawfully took over the LLC, interfered with the sale of the property to a third-party buyer, and then encumbered and occupied the property. Following the first phase of a bifurcated bench trial, the trial court tentatively found plaintiff was a member of the LLC. Later, in issuing its statement of decision, the court held plaintiff was not a member of the LLC and entered judgment for Bry.

On appeal, plaintiff argues the court lacked authority to change its tentative ruling. Plaintiff also asserts that as a matter of law, he was a member of the LLC or, alternatively, was in a

partnership with the LLC.  We affirm because the trial court acted within its inherent authority to reconsider its interim ruling, both the record and the law support the court's finding that plaintiff was not a member of the LLC, and plaintiff failed to advance the partnership theory below.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Real Estate Venture

In 2011, plaintiff and Cooper orally agreed to purchase, renovate, and sell the property.  This was their third house-flipping project.[1]  As with their previous projects, plaintiff, a contractor, handled the design and renovation, and Cooper financed the project.  For his work, plaintiff received a construction supervision fee of $120,000.[2]

In May 2011, through attorney Alan Carnegie, Cooper created the LLC to hold title to the property.  Carnegie communicated with both Cooper and plaintiff in connection with preparing and filing documents with the Secretary of State, which listed Cooper as the LLC's managing member.  The documents did not identify how many members were in the LLC.

In June 2011, the LLC purchased the property for $1,553,546.  Cooper declared in an affidavit submitted to the title company that the LLC "was just formed and there is no

---

[1]     For their first project, they formed an LLC.  They conducted their second project as a partnership.

[2]     In December 2011 and March 2012 emails to plaintiff, Cooper indicated the construction supervision fee was an advance as against plaintiff's share of the profits, not additional compensation.

3

Operating Agreement and . . . I am the only Member and Managing Member . . . ." For the purchase, Cooper contributed his own funds and borrowed $1.4 million from Bry, secured by a deed of trust on the property recorded in favor of Bry. The property was the LLC's sole asset. Cooper also borrowed additional funds from Bry for the renovation.

In the summer of 2011, Cooper sought to refinance the property with City National Bank. In applying for the loan, he provided the bank with a copy of the LLC's operating agreement, which listed Cooper as the 100 percent member and his brother-in-law, Richard Geisman, as the non-member manager. In September 2011, Cooper turned down the City National Bank loan and opted to stay with Bry's funding.

In 2012, through his certified public accountant, Cooper signed and filed the LLC's federal 2011 tax return, indicating Cooper was the LLC's sole member. Cooper checked the box stating "This LLC is not in a partnership with any other entity."

In April 2012, the property was listed for sale and marketed.[3] In late November 2012, a buyer offered $3,695,000 for the property, but cancelled the offer in December 2012.

On January 3, 2013, Cooper passed away. On January 18, 2013, a second potential purchaser submitted a $3.4 million offer to purchase the property. This offer was not accepted. Plaintiff believed this buyer would eventually offer $3.5 million.

On January 31, 2013, Bry purchased the LLC from Cooper's widow. In exchange, Bry forgave Cooper's debts. During negotiations for the sale, Cooper's lawyer, Todd Grayson,

---

[3] However, the house was incomplete and there was no certificate for occupancy even by January 2013.

gave Bry the LLC's operating agreement, dated May 15, 2011. On several pages, Cooper appeared to have signed in his capacity as president of his corporation, G.H. Cooper Properties, Inc. However, the document identified Cooper (not G.H. Cooper Properties, Inc.) as the sole member of the LLC. Geisman also signed the agreement as non-member manager of the LLC.

By the time of Bry's purchase, the real estate venture had cost at least $3,746,000, including interest from the loans.

## II.    Plaintiff's Lawsuit

In 2014, plaintiff filed a complaint against Cooper's widow and unnamed Doe defendants. In his first amended complaint, plaintiff added allegations against Bry and Geisman (the non-member manager of the LLC), and sought involuntary dissolution and winding up of the LLC. After successive demurrers, plaintiff filed the fourth amended complaint (4AC), the operative pleading at trial.

The 4AC alleged contractual interference and sought to dissolve the LLC. Plaintiff alleged that in mid-June 2011, he and Cooper signed an operating agreement for the LLC, which stated he and Cooper each owned 50 percent of the LLC. Plaintiff did not retain a copy of the executed operating agreement, but Cooper maintained the original in Cooper's office. Plaintiff found an unsigned copy of the operating agreement in a box in his garage in May 2014, while preparing for this litigation. (For ease of discussion, we refer to this operating agreement as the "garage agreement," as the parties did below.) Per the garage agreement, in consideration for his "sweat equity" supervising renovations at the property, plaintiff was to receive both a construction supervision fee equal to 10 percent of the total cost of construction (up to $150,000) and 50 percent of the net profit

5

generated by the lease and/or sale of the property. Plaintiff asserted that Bry interfered with plaintiff's rights under the garage agreement by preventing the sale of the property to the buyer who had offered $3.4 million and by purchasing the property for himself.

The court would later explain that the inconsistencies between the five iterations of plaintiff's complaints led the court to doubt plaintiff's credibility in asserting the existence of the garage agreement. Without explanation, plaintiff inflated his construction supervision fee from $125,000 in the original complaint to $150,000 in the 4AC. The original complaint alleged plaintiff "believed" the LLC was governed by a signed operating agreement. Yet, the 4AC asserted that plaintiff signed the garage agreement in Cooper's office and that he periodically saw the agreement in a tan folder in Cooper's filing cabinet.

## III.   The Bench Trial

Prior to trial, plaintiff dismissed with prejudice his claims against Cooper's widow and Geisman. Bry was the only defendant involved in the bench trial and subsequent proceedings.

Plaintiff and Bry stipulated to a bifurcated trial. In the first phase, the court would decide what kind of contractual relationship existed between plaintiff and Cooper regarding the development of the property. If successful in proving his membership in the LLC, plaintiff could elect to proceed with a bench trial on his dissolution claim, or with a jury or bench trial to determine Bry's liability on the contractual interference claim.

In November 2018, the trial court heard two days of testimony and admitted evidence in the first phase bench trial. Central to the dispute were three operating agreements:  (1) the

6

garage agreement, (2) the signed operating agreement Cooper furnished City National Bank (the CNB agreement) when he sought to refinance, and (3) the signed operating agreement Bry received from Grayson when in negotiations to purchase the LLC (the Grayson agreement).

### a.     Plaintiff's Case

**The Garage Agreement.**  Plaintiff testified that on May 26, 2011, he and Cooper executed the garage agreement, which created the LLC to hold title to the property.  The garage agreement identified plaintiff and Cooper as 50 percent members of the LLC.  Plaintiff asserted Cooper stored the signed agreement in Cooper's garage office, but Cooper's associates destroyed it after his death.  Plaintiff testified he found an unsigned copy of the garage agreement in storage prior to filing his complaint.

Carnegie, the lawyer who prepared and filed the LLC's articles of incorporation, testified he was under the impression that Cooper and plaintiff were both members of the LLC, but he did not see the operating agreement.  Plaintiff had told Carnegie he wanted a two-member LLC.  The articles filed with the Secretary of State did not specify the number of members but solely identified Cooper as the managing member.

The real estate agent Cooper used to purchase the property and the senior vice president of the real estate division at City National Bank both testified they believed plaintiff and Cooper were partners.

**The CNB Agreement.**  Plaintiff testified that after the garage agreement was executed, Cooper had contemplated making it a single member LLC in order to refinance the property with City National Bank.  Cooper created and signed the CNB

7

agreement, which showed the LLC had only one member, and provided it to the bank.  Plaintiff argued that conversion to a single member LLC was never realized because Cooper declined the City National Bank loan, opting to maintain Bry's funding. Plaintiff also presented evidence that around the time Cooper sought a loan from City National Bank, Cooper had drafted another agreement to create a partnership between the LLC and plaintiff.  Plaintiff asserted this partnership agreement was not finalized because the single-member LLC was never formed under the CNB agreement.

**The Grayson Agreement.**  Plaintiff contended the final operating agreement—the Grayson agreement—was fraudulent. The material difference between the Grayson agreement and the CNB agreement was that the Grayson agreement indicated the LLC's sole member was Cooper's corporation, not Cooper. Plaintiff's theory was that Grayson (Cooper's attorney) altered the single-member CNB agreement to create the forged Grayson agreement, which Grayson presented to Bry in negotiating the sale of the LLC for Cooper's widow.  In that vein, plaintiff elicited testimony from a handwriting expert who stated Cooper may not have been the one who wrote two of the three signatures in the Grayson agreement.

Plaintiff also examined Geisman and Grayson, both of whom were instrumental in preparing documents to transfer the LLC to Bry.  Neither Geisman nor Grayson was forthcoming in their testimony, testifying they did not recall significant events. The court opined they lacked credibility and appeared to have forged the Grayson agreement to protect Cooper's widow.

### b.    Bry's Case

Bry testified that when he was in negotiations to purchase the LLC, Cooper's attorney, Grayson, represented that plaintiff had no membership interest.  When plaintiff told Bry he was a 50 percent member, Bry asked for documentation of plaintiff's interest in the LLC, which plaintiff could not provide.  Grayson subsequently gave Bry the May 15, 2011 operating agreement, which showed that either Cooper or Cooper's corporation, G.H. Cooper Properties, Inc., was the LLC's sole member.  Bry believed he purchased the LLC clear and free of plaintiff's interest based on (1) the LLC's tax return showing it was entirely owned by Cooper, (2) repeated statements from the Cooper family that it was the 100 percent owner of the LLC, and (3) the operating agreement, which stated Cooper was the sole owner.

Bry elicited testimony from Cooper's accountant, who in September 2012, filed the LLC's 2011 tax returns.  Those tax returns stated that Cooper was the sole member of the LLC, and that the LLC was "not in a partnership with any other entity."

### c.    Tentative Decision

On May 29, 2019, the court heard closing arguments and issued a tentative decision, finding by a preponderance of the evidence that plaintiff was a 50 percent member of the LLC.  The court did not specify which version of the operating agreement controlled.

## IV.   Stay for Valuation Proceeding

After the court issued its tentative decision, Bry served and filed a notice of election to buy out plaintiff's 50 percent interest in the LLC pursuant to the Corporations Code.  Plaintiff objected, moved to strike Bry's notice of election, and filed a notice of election to pursue his fourth cause of action to dissolve the LLC.

9

The court denied plaintiff's motion to strike Bry's notice of election and stayed the second phase of the trial pending a separate valuation proceeding pursuant to Corporations Code section 17707.03, subdivision (c)(2).[4]

After much dispute between the parties, the trial court established January 31, 2013 as the date of valuation. In mid-March 2021, the court conducted an appraisal hearing after reviewing valuations from the court-appointed neutral appraiser and the parties' appraisers. The court adopted the findings of the neutral appraiser and the appraiser nominated by Bry that the value of plaintiff's membership interest in the LLC as of January 31, 2013, was either less than zero, or at best, one dollar. Those appraisers found the purchase and renovation costs for the property were at least $197,836 more than its fair market value as of the valuation date. The court found plaintiff's interest did not have positive value and ordered Bry to prepare a judgment and final decree.

## V.  Statement of Decision

Plaintiff requested that the trial court issue a statement of decision addressing the basis for its decision that plaintiff was a member of the LLC. After reviewing the evidence, the court

---

[4]    All subsequent statutory references are to the Corporations Code.

Section 17707.03 permits a court to order the dissolution of a limited liability company at the request of a member. Pursuant to subdivision (c)(2) of that section, if a member elects to purchase the other member's ownership interest, the court is required to stay the dissolution proceedings for a determination of the fair market value of the membership interests.

concluded there was insufficient evidence to find that plaintiff was a member of the LLC. In April 2021, the court notified the parties of its decision to reverse course. Bry then submitted a proposed statement of decision and plaintiff filed his objections to it.

The court prepared its own 28-page statement of decision, thoroughly discussing the history of the case and its finding that plaintiff was not a member of the LLC. The court found that plaintiff had an oral agreement with Cooper to split the proceeds of the sale, that the money given to plaintiff at the inception of the project was an advance on these sale proceeds, and that Cooper subsequently created the LLC to hold title to the property. Plaintiff was neither a member of the LLC nor in a partnership with the LLC. Plaintiff therefore failed to prove his claims for intentional interference with contractual relations or dissolution of the LLC, because both were premised on plaintiff being a member of the LLC under the garage agreement.

The court meticulously explained its findings. Because the court's statement of decision is the focus of plaintiff's arguments on appeal, we quote the court's decision at length:

> [T]he Court herein finds [plaintiff] has failed to meet his burden of proof that he is a member of Berkeley View, LLC. Nor was there any credible evidence that [plaintiff] entered into a partnership or joint venture with the LLC. The pleadings and the evidence clearly show that [plaintiff] and Cooper entered into the Project based on an oral agreement between [plaintiff] and Cooper, and that "[t]he joint venture legal structure did not matter to [plaintiff] because he trusted Cooper, [and] had received numerous writings from Cooper acknowledging the 50/50 split of proceeds from the exploitation of the

11

developed project." . . . A "50/50 split of proceeds from the exploitation of the developed project" is precisely what the evidence shows and nothing further.

Again, in reaching this conclusion, the Court finds that the unsigned Garage Agreement . . . does not reflect the terms of the agreement between [plaintiff] and Cooper and is therefore not the LLC Operating Agreement. It does not make sense that [plaintiff] would get paid up to $150,000 for supervising construction (his contractor's license was suspended) and receive 50 percent of the equity in the Project, as per his testimony and the Garage Agreement. Again, [emails from Cooper to plaintiff] directly contradict the Garage Agreement and [plaintiff]'s testimony to that effect. [¶] . . . [¶]

In addition, the Court finds it significant that there is no mention of the signed LLC Operating Agreement or . . . the unsigned Garage Agreement[] in either the original [complaint] or the First Amended Complaint, even though Plaintiff testified he located the Garage Agreement sometime in May 2014 when preparing for this litigation. To the contrary, in his [original c]omplaint, filed four months later, on September 10, 2014, at paragraph 30, [plaintiff] states "it is at this time [June 28, 2011] that [plaintiff] believes he and [Cooper] executed an operating agreement for Berkeley View, LLC." The Court is troubled by the failure of Plaintiff to specifically identify the Garage Agreement in his [original c]omplaint as the Operating Agreement he and Cooper signed, especially given his claim that he had, by that time, already located it in his garage.

12

Equally problematic is the juxtaposition of the above statement, i.e., [plaintiff] 'believes he and [Cooper] executed an operating agreement for Berkeley View, LLC,' with [plaintiff]'s position in the [4AC], that in mid-June 2011, he "signed the Berkeley Operating Agreement in [Cooper's] office and gave the original back to [Cooper]," and in the [third amended complaint] that he saw the LLC Operating Agreement in Cooper's office on January 5, 2013, two days after Cooper [died].

Simply put, it is difficult to reconcile these inconsistent allegations. Nor is it clear how greater clarity arrived after multiple demurrers had been sustained.

The Court finds [plaintiff]'s allegation in the [second amended complaint] to be far more likely true than any of the others, i.e., that "[t]he joint venture legal structure did not matter to [plaintiff] because he trusted Cooper, had received numerous writings from Cooper acknowledging the 50/50 split of proceeds from the exploitation of the developed project . . . ."

In addition, . . . the operating agreement presented to City National Bank as the operating agreement for the LLC, presents yet another hurdle [plaintiff] failed to surmount. According to [plaintiff], even though Cooper submitted this 'alternative' operating agreement to [City National Bank], it did not go into effect because Cooper ultimately chose not to accept the City National Bank offer.

The Court does not condone picking and choosing agreements as it suits the parties. Nor does the Court believe in legal fictions. When the City

13

National Bank proposal was submitted with Plaintiff's knowledge, to the extent there was a Garage Agreement, it was vitiated.

As such, and for all the above reasons, the Court finds that the Garage Agreement did not control the relationship between Cooper and [plaintiff] at the time of Cooper's death or any other time. . . .

Pursuant to this analysis, the Court acknowledges that one possibility is the [CNB] agreement was in force and effect at the time of Cooper's passing. If this were the case, [plaintiff]'s claims necessarily fail because he is not a member of the LLC under that agreement.

Far more likely, though, is there was solely an oral agreement between Cooper and [plaintiff]; wherein the two friends agreed to a "50/50 split of [the] proceeds from the exploitation of the developed project." Unfortunately, this, too, is problematic for several reasons. First, in the bench trial, counsel for [plaintiff] expressly represented to the Court that he was not relying on any type of oral agreement or partnership agreement but was instead relying on the Garage Agreement. . . .

Second, and regardless of any representation by counsel that no claim based on an oral agreement was being advanced, if Plaintiff's only retreat is to a claim based on an oral agreement between him and the deceased, then such a claim is barred either by Code of Civil Procedure section 366.2 or [plaintiff]'s failure to bring any such claim under the applicable provisions of the Probate Code, let alone such a claim in this action.

14

This case proceeded to trial with [plaintiff] (1) alleging in the pleadings, (2) representing to the Court at the inception of trial; and (3) arguing at the conclusion of the first phase of the trial that he was a 50 [percent] member of Berkeley View, LLC, *based on the Garage Agreement*, an argument which the Court herein rejects. There is no allegation in any of the five iterations of the complaint, nor was any credible evidence presented, that [plaintiff] entered into an oral partnership agreement with the LLC, or that one was proposed. Thus, the only plausible agreement relating to the Project, based on the evidence presented at trial, is that an oral agreement was reached between [plaintiff] and Cooper, one which [plaintiff] chose not to pursue in litigation.

The trial court also held that plaintiff could not prove damages based on the prior valuation proceeding showing that plaintiff had no positive interest in the LLC. The court concluded that because plaintiff failed to prove he had a membership interest in the LLC and could not prove damages, plaintiff had no viable cause of action for tortious interference with contractual relations or for dissolution of the LLC.

On September 28, 2021, the court entered judgment in favor of Bry. Plaintiff timely appealed.

## DISCUSSION

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence

15

in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) As the reviewing court, we do not reweigh evidence or assess witness credibility. (*Ibid.*)

The crux of this case is whether plaintiff had a membership interest in the LLC. Without a membership interest, he lacked standing to litigate claims for interfering with his rights under the LLC's operating agreement or for dissolution of the LLC. (See *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148 ["To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove . . . the existence of a valid contract between the plaintiff and a third party"]; § 17707.03 [manager or member may bring action for judicial dissolution of LLC].)

Plaintiff makes two arguments about the court's membership finding. First, plaintiff asserts the trial court lacked authority to change its tentative decision that plaintiff was a member. Second, plaintiff asserts that, as a matter of law, he was a member of the LLC or in a partnership with the LLC. We address each in turn.

## I. The Trial Court Had Inherent Authority to Reconsider Its Interim Ruling on Plaintiff's Status as a Member of the LLC

Plaintiff contends that "as a matter of law, procedural due process and fundamental fairness, the court had no authority to change its phase one bifurcated trial ruling that [plaintiff] is a member of [the LLC] two-and-a-half years later, after [plaintiff] made an election to dissolve [the LLC] based on the court's ruling."

16

We disagree. It is well established that the trial court possesses inherent authority to reconsider its own interim orders prior to entry of final judgment. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1106–1108.) Further, California Rules of Court, rule 3.1590(b) makes clear: "The tentative decision does not constitute a judgment and is not binding on the court. If the court subsequently modifies or changes its announced tentative decision, the clerk must serve a copy of the modification or change on all parties that appeared at the trial."

"[W]here a matter is tried to the court as here, the trial judge has broad discretion to reopen the matter prior to final judgment, even over the objection of the litigants. 'Within reasonable limits, it is not only the right but the duty of a trial judge to clearly bring out the facts so that the important functions of his office may be fairly and justly performed. [Citations.] For the same reason the trial judge is not to be unduly and unreasonably hampered in his control or conduct of the trial.' [Citations.] . . . [T]he trial court may sometimes even need to vacate a prior formal order on a matter and consider additional new evidence in light of the applicable legal theory." (*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1611 (*Coit Drapery*).)

The Supreme Court has explained that the trial court's authority to reconsider interim rulings "derives from the judiciary's fundamental, constitutionally mandated function to resolve specific controversies between parties." (*Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1248 (*Brown*).) To preserve procedural fairness, when the trial court chooses to reconsider an interim ruling, the court "must provide the parties 'notice that it may do so and a reasonable opportunity

17

to litigate the question.' " (*Ibid.*) " ' "All that fairness requires is that the new theory, which the judge decides is the correct one, be disclosed to the opposing party so that he may have a full opportunity to meet it." ' [Citations.] Such a procedure, while admittedly very unusual, does not violate the litigants' rights when adequate notice is given, as here—and may, in fact, be required in order to reach a just result." (*Coit Drapery, supra,* 14 Cal.App.4th at pp. 1611–1612.)

Here, the court informed the parties of its intention to modify its earlier tentative and gave the parties an opportunity to respond. Plaintiff filed a 32-page brief, which challenged the court's newly changed findings, and submitted dozens of exhibits. The court then addressed plaintiff's arguments in its final statement of decision. We conclude the court afforded plaintiff due process. (See *Brown, supra,* 47 Cal.4th at p. 1248.)

In asserting the court lacked authority to change its tentative statement of decision, plaintiff cites *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, and *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252. Neither case addresses the trial court's power to change its prior tentative findings of fact or conclusions of law, let alone holds that a trial court may not do so. Rather, these cases address the impact of earlier findings made in a bifurcated trial. (See *Arntz,* at p. 487, and *Orange County Water Dist.,* at p. 355, fn. 52.)

Plaintiff also argues that "the ruling became final in June 2019 when the court required [plaintiff] to elect between his two pled claims." First of all, plaintiff cites no authority to support his legal conclusion that a tentative from a first phase of trial becomes final because a party elects to proceed to the second

18

phase of trial on a particular cause of action. To the contrary, California Rules of Court rule 3.1591(c) states, "A judge may proceed with the trial of subsequent issues before the issuance of a statement of decision on previously tried issues."

Second, plaintiff mischaracterizes the record. Plaintiff was not forced by the court to choose whether to pursue a particular cause of action, nor did the court's decision corner him into a particular trial strategy. Regardless of which cause of action plaintiff pursued, he necessarily needed to prove he was a member of the LLC. Notably, it was only after Bry's election to buy out plaintiff's membership interest that plaintiff sought to proceed on his dissolution claim.

In sum, the trial court acted well within its inherent authority to reconsider interim orders prior to entry of final judgment. By noticing its intent to reverse its tentative and giving plaintiff the opportunity to be heard prior to its final ruling, the court ensured fairness and that plaintiff was afforded due process.

## II. The Trial Court Did Not Err in Finding Plaintiff Was Not a Member of the LLC

In his opening brief, plaintiff "acknowledges that at the Phase One trial, there was substantial evidence presented on both sides" of the issue of whether plaintiff was a member of the LLC. We agree. The evidence at trial included two signed agreements identifying the LLC as a single-member company, statements made by Cooper under penalty of perjury to the Internal Revenue Service and title company that he was the sole member, and plaintiff's inconsistent pleadings that created doubt about plaintiff's credibility.

19

Nonetheless, plaintiff asserts that as "as a matter of law" he is a member of the LLC. In support, plaintiff urges that the trial court found plaintiff "and Cooper 'unquestionably' agreed to be 50-50 partners in the real estate venture." Plaintiff concludes that as partners, plaintiff and Cooper created the LLC to hold title to the "partnership asset," the property. Plaintiff argues that once the LLC was created, plaintiff "as a matter of law had a legal relationship with" the LLC.

We are unpersuaded, as plaintiff mischaracterizes the record and the law. First, the trial court did not find plaintiff and Cooper were in a partnership. While the court stated plaintiff "has unquestionably proven he and Cooper had an agreement to split the net 'proceeds from the exploitation of the developed project,'" the court did not find plaintiff and Cooper entered into a *partnership*. Second, at trial, plaintiff "expressly represented to the Court that he was not relying on any type of oral agreement or partnership agreement but was instead relying on the Garage Agreement." Third, the court never found that plaintiff had a role in creating the LLC. The court instead found that Cooper made a single-member LLC, independent of plaintiff.

Fourth, plaintiff jumps to the conclusion that the property is "partnership property." We do not agree. Under section 16204, subdivision (d), "[p]roperty acquired in the name of one or more of the partners, without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership and without use of partnership assets, is presumed to be separate property, even if used for partnership purposes." Even if we were to assume the existence of a partnership, there is no evidence the property was a partnership asset. Nothing on the deed indicates the property

20

is a partnership asset.  Further, Cooper acquired the property in the name of his single-member LLC, partly by spending his own assets and partly by taking on a large amount of debt for which he was solely liable.

For all of these reasons, we reject plaintiff's argument that he was a member of the LLC as a matter of law.

## III.   Plaintiff Cannot Now Pursue a Partnership Theory, Which Was Not Alleged or Argued at Trial

To the extent plaintiff contends on appeal he was in a partnership with the LLC, he did not plead a partnership with the LLC in any complaint or pursue this theory at trial.  The 4AC solely alleged that plaintiff was a member of the LLC.

At trial, plaintiff told the court that he was not relying on an oral agreement or a partnership agreement.  The court asked plaintiff's counsel:  "So you're not going to be taking an inconsistent position that there was a partnership?"  Plaintiff's counsel responded:  "You are correct.  You are correct.  So that was the alternative track that didn't happen."  Plaintiff relied entirely on the garage agreement to prove his membership in the LLC.

One of plaintiff's PowerPoint slides presented during closing arguments stated:  "The two competing issues to be decided in the First Phase Bench Trial are:  (1) Were [plaintiff] and Cooper the two individual members of [the] LLC when Cooper died in January 2013, as plaintiff . . . contends? or (2) Was [Cooper's corporation, G.H. Cooper Properties, Inc.] the sole member of [the] LLC with Geisman its 'non-member manager' when Cooper died in January 2013, as defendant Bry contends? . . .  Based on the preponderance of the evidence, the substantial trial evidence shows that [plaintiff] and Cooper were each

21

individual members of [the] LLC.  Conversely, the evidence does not show that [G.H. Cooper Properties, Inc.] was the sole member of [the] LLC, and that Geisman was its non-member manager."

As the trial court summarized in its statement of decision:

> There is no allegation in any of the five iterations of the complaint, nor was any credible evidence presented, that [plaintiff] entered into an oral partnership agreement with the LLC, or that one was proposed.  Thus, the only plausible agreement relating to the Project, based on the evidence presented at trial, is that an oral agreement was reached between [plaintiff] and Cooper, one which [plaintiff] chose not to pursue in litigation.

It is well settled that " 'the theory upon which a case is tried must be adhered to on appeal.  A party is not permitted to change his position and adopt a new and different theory on appeal.  To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874.)  "Despite this general rule, courts have discretion to consider a new theory on appeal if it involves a legal question based on undisputed facts." (*Vasquez v. SOLO 1 Kustoms, Inc.* (2018) 27 Cal.App.5th 84, 96.)

Plaintiff's partnership argument challenges the judgment on a theory not advanced below, and presents not just a question of law, but a question of fact. Accordingly, we will not consider this partnership theory on appeal.[5]

<hr />

[5] Plaintiff raises many other issues on appeal that presume he has a membership interest in the LLC. We decline to address these as plaintiff is not a member of the LLC and therefore lacks standing to pursue them. (See *Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 809 ["Standing is a threshold issue necessary to maintain a cause of action."].) We also decline to address whether plaintiff's potential claim against Cooper's estate is barred by the statute of limitations because this issue was not properly before the trial court (plaintiff had not filed claims against Cooper's estate) and is therefore not ripe for our discussion. (See *Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452 [" 'The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions.' "].)

## DISPOSITION

The judgment is affirmed.  Defendant Richman Bry is awarded his appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

 

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.